10-2181-cv, 10-2418-cv
M.H. & E.K. o/b/o P.H.; M.S. & L.S. o/b/o of D.S. v. NYC Dep't of Education

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: April 25, 2011          Decided: June 29, 2012)

-------------------------------------

M.H. AND E.K. individually and collectively on behalf of P.H.,

Plaintiffs-Appellees,

- v -                                    Docket No. 10-2181

New York City Department of Education,

Defendant-Appellant.

-------------------------------------

M.S. individually, M.S., collectively and on behalf of D.S.,
L.S., individually, L.S., collectively and on behalf of D.S.,

Plaintiffs-Appellants,

- v -                                    Docket No. 10-2418

New York City Department of Education,

Defendant-Appellee.

-------------------------------------

Before:   SACK, LIVINGSTON, and LYNCH, Circuit Judges.

Appeals from opinions and orders in two different cases decided in the United States District Court for the Southern District of New York (Loretta A. Preska, Chief Judge, and Lewis A. Kaplan, Judge, respectively), granting, in M.H., the

plaintiffs' motion for summary judgment and, in M.S., the New York City Department of Education's motion for summary judgment. The plaintiffs in both cases are the parents of disabled children who challenged the procedural and substantive adequacy of the Individualized Education Plans that the defendant, New York City Department of Education, had developed for the plaintiffs' children pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. The plaintiffs also sought reimbursement of funds spent on private-school tuition for their children.

In M.H., we conclude that the district court properly agreed with the determinations of the Impartial Hearing Officer who initially considered the matter in the State's administrative scheme, and properly rejected the subsequent determinations of the State Review Officer. In M.S., although we conclude that the magistrate judge -- who recommended granting the Department's motion for summary judgment -- overstated the extent to which federal courts must defer to the findings of state administrative officers, we conclude that the Department's motion was properly granted.

Affirmed.

JULIE STEINER (G. Christopher Harriss, Stephen J. McGrath, Andrew Rauchberg, of counsel, on the brief), on behalf of Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New

York, <u>for Defendant-Appellant New York City Department of Education</u>.

JESSE COLE CUTLER (Samantha Bernstein, on the brief), Skyer and Associates, L.L.P., New York, New York, <u>for Plaintiffs-Appellees M.H. and E.K on behalf of P.H.</u>; <u>for Plaintiffs-Appellants M.S. and L.S. individually and collectively on behalf of D.S.</u>.

SACK, <u>Circuit Judge</u>:

**BACKGROUND**

Both of these appeals, which we heard in tandem, concern the proper interpretation of the Individuals with Disabilities Education Act ("IDEA"),[1] 20 U.S.C. § 1400 <u>et seq.</u> They each involve unique facts which must therefore be set out in considerable detail in order to address the legal issues they

---

[1] **Glossary of Acronyms**: This opinion, dealing as it does with the IDEA and practices thereunder, is replete with acronyms. In addition to their definition in the text, a separate glossary of acronyms is therefore set forth in the Appendix to this opinion. <u>Cf. Nat'l Assoc. of Regulatory Util. Comm'rs v. U.S. Dep't of Energy</u>, Nos. 11-1066, 11-1068, --- F.3d ---, 2012 WL 1957942, at *6, n.1, 2012 U.S. App. LEXIS 11044, at *3, n.1 (D.C. Cir. June 1, 2012) (Silberman, <u>J.</u>) (referring to court's Handbook of Practice and Internal Procedures' statement that "'parties are strongly urged to limit the use of acronyms' and 'should avoid using acronyms that are not widely known.'" "Brief-writing, no less than 'written English, is full of bad habits which spread by imitation and which can be avoided if one is willing to take the necessary trouble.' George Orwell, 'Politics and the English Language,' 13 Horizon 76 (1946). Here, both parties abandoned any attempt to write in plain English, instead abbreviating every conceivable agency and statute involved, familiar or not . . . .").

raise.[2]  The cases both require us to address the manner in which the federal courts must go about their IDEA-mandated review of state administrative decisions.

The IDEA

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A)-(B); see also Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009) (concluding that a court could award private-school-tuition reimbursement to the parents of disabled children not provided a "Free Appropriate Public Education"). "The IDEA offers federal funds to states that develop plans to assure 'all children with disabilities' [residing in each such state] a 'free appropriate public education,' 20 U.S.C. § 1412(a)(1)(A)."  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003).

---

[2] Factual complexity is not an unusual feature of IDEA appeals. See, e.g., Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 123-29 (2d Cir. 1998) (describing the complex factual history of a case involving a child challenging an IEP who had been diagnosed with, among other things, "Minimal Brain Dysfunction syndrome with an attention deficit disorder and hyperactivity, developmental language disorder, a mild to moderate separation anxiety disorder, and obsessive compulsive disorder, and Tourette's Syndrome.").

"To meet [the IDEA's] requirements, a school district's program must provide 'special education and related services[,]' [20 U.S.C. § 1401(9)], tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (some internal quotation marks omitted); see also Grim, 346 F.3d at 379 (similar). These services "must be administered according to an 'individualized education program' . . . , which school districts must implement each year for each student with a disability." Id. (quoting 20 U.S.C. § 1414(d)).

An individualized education program ("IEP") is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507-08 (2d Cir. 2006) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)), amended on other grounds, 480 F.3d 138 (2d Cir. 2007). Under the IDEA, for a child's IEP to be adequate, it must be "[']likely to produce progress, not regression, and [must] . . . afford[] the student with an opportunity greater than mere trivial advancement.'" T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254

(2d Cir. 2009) (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005)).  However, it need "not . . . furnish every special service necessary to maximize each handicapped child's potential."  Grim, 346 F.3d at 379 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 199 (1982)) (brackets, ellipsis, and internal quotation marks omitted).  Under an IEP, "education [must] be provided in the 'least restrictive setting consistent with a child's needs.'"  Id. (quoting Walczak, 142 F.3d at 122 (2d Cir. 1998)).  The IEP is "[t]he centerpiece of the IDEA's educational delivery system."  D.D. ex rel. V.D., 465 F.3d at 507 (internal quotation marks omitted).

"Since New York State receives federal funds under IDEA, it is obliged to comply with the requirements of this law. To meet these obligations and to implement its own policies regarding the education of disabled children, the State has assigned responsibility for developing appropriate IEPs to local Committees on Special Education [('CSEs')], the members of which are appointed by school boards or the trustees of school districts."  Walczak, 142 F.3d at 123 (citing N.Y. Educ. Law § 4402(1)(b)(1)).  "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107-08 (citing N.Y. Comp. Codes R. & Regs.

6

("NYCCRR") tit. 8, § 200.1(ww)(3)(i)). "[T]he CSE must also be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." Id. at 108 (citing 20 U.S.C. § 1412(a)(5)) (second set of brackets in original).

If a New York parent "believe[s] an IEP is insufficient under the IDEA," he or she "may challenge it in an 'impartial due process hearing,' 20 U.S.C. § 1415(f), before an [Impartial Hearing Officer, or 'IHO'] appointed by the local board of education." Grim, 346 F.3d at 379 (quoting N.Y. Educ. Law § 4404(1)). At the hearing before the IHO, "the school district has the burden of demonstrating the appropriateness of its proposed IEP." Id. As the governing New York State statute explains:

> The board of education or trustees of the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing, except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement.

7

N.Y. Educ. Law § 4404(1)(c).[3]  An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education.  Grim, 346 F.3d at 379-80.[4]

---

[3]  In Schaeffer ex rel. Schaeffer v. Weast, 546 U.S. 49 (2005), the Supreme Court concluded that the IDEA placed the burden of challenging an IEP on the party bringing the challenge. Id. at 57-58.  The Court, however, left unanswered the question whether states could "override the default rule and put the burden always on the school district." Id. at 61-62.  Since Schaeffer, New York has amended its statutory scheme to reallocate the burden to the District, even in cases where the parents are challenging the IEP.  See W.T. v. Bd. of Educ. of School Dist. of N.Y.C., 716 F. Supp. 2d 270, 287 (S.D.N.Y. 2010).  We need not, however, resolve the question the Supreme Court left open in Schaeffer -- whether the State has the power to override the IDEA burden scheme. Because the State Review Officers in the cases at bar concluded that the IEPs were proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the respective Review Officers erred is properly understood to fall on the plaintiffs.  See id.  To the extent that the district court in these cases, or this Court on review, must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise.  See Nw. Mut. Life Ins. Co. v. Linard, 498 F.2d 556, 560 (2d Cir. 1974); see also Schaeffer, 546 U.S. at 58 ("Petitioners also urge that putting the burden of persuasion on school districts will further IDEA's purposes because it will help ensure that children receive a free appropriate public education. In truth, however, very few cases will be in evidentiary equipoise.").  That is not the situation here.

[4]  The overlapping roles of the State and the School District in IDEA cases in New York further complicate the confusing, alphabet-soup nature of IDEA cases brought in New York City . In New York, the School District -- here the defendant New York City Department of Education -- is responsible for complying with the IDEA.  The School District also appoints the IHO, who is responsible for determining whether the School District has met its obligations under the IDEA.   If, however, either party is dissatisfied with the decision of the IHO, it may appeal the decision to the SRO, who, unlike the IHO, is appointed by the State's Education Department.  See generally N.Y. Educ. Law. § 4404.  In this opinion, we refer to the City's Department of

8

Generally, either "party aggrieved" by the findings of the SRO "shall have the right to bring a civil action" in either state or federal court.  20 U.S.C. § 1415(i)(2)(A).  When such an action is brought in federal district court, the court reviews the records of all of the prior administrative hearings and must hear additional evidence if so requested by either of the parties.  Id. at § 1415(i)(2)(c).  The court typically considers the propriety of the IEP on the parties' cross motions for summary judgment.

However,

> a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits.

Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).  "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]."  Id. (ellipsis, brackets, and citation omitted).  "[B]asing its decision on the preponderance

Education as the "DOE" or the "School District."  We refer to the State's Education Department as the "Education Department."

9

of the evidence, [the court is required to] grant such relief as the court determines is appropriate."  § 1415(i)(2)(C)(iii).

In the separate proceedings consolidated for purposes of this appeal, the parent plaintiffs assert that the school districts serving their children, having failed to provide each of them with a free appropriate public education ("FAPE"), must reimburse the parents for the costs associated with sending these children to private schools for an appropriate education. Although these cases are similar to many IDEA cases in this regard, see, e.g., Gagliardo, 489 F.3d at 106, they inevitably involve distinct facts and procedural histories.

M.H. Background

P.H., the son of M.H. and E.K., was born on October 11, 2001.  He is autistic.  During the 2006-07 school year, when P.H, was of pre-school age, he attended a mainstream preschool. Pursuant to a mandate of the Committee on Preschool Special Education (the "CPSE") of the New York State Education Department, he received Special Education Itinerant Teacher ("SEIT") services on a one-to-one ("1:1") basis.  The SEIT worked one-on-one with P.H. throughout the school day at P.H.'s home. Plaintiffs' 56.1 Statement ¶¶ 2-3, M.H. v. N.Y.C. Dep't of Educ., 712 F. Supp. 2d 125 (S.D.N.Y. 2010) (No. 09 Civ. 3657), ECF No. 13 ("Pls. 56.1 Stmt."); Defendants' 56.1 Response ¶¶ 2-3, M.H. v. N.Y.C. Dep't of Educ., 712 F. Supp. 2d 125 (S.D.N.Y. 2010) (No.

10

09 Civ. 3657), ECF No. 19 ("Def.'s 56.1 Resp."). Pursuant to the CPSE mandate, P.H.'s SEITs were trained in Applied Behavior Analysis ("ABA")[5] and provided at least 35 hours weekly of services using that approach. Pls.' 56.1 Stmt. ¶¶ 2-3; Def.'s 56.1 Resp. ¶¶ 2-3.

In addition, P.H. received several related services weekly, including five 60-minute speech therapy sessions; three 60-minute occupational therapy sessions; and two 60-minute physical therapy sessions. Pls.' 56.1 Stmt. ¶ 4; Def.'s 56.1 Resp. ¶ 4.

The DOE's CSE convened a meeting on April 17, 2007, to discuss P.H.'s educational program for the 2007-08 school year –

---

[5]

> ABA uses careful behavioral observation and positive reinforcement or prompting to teach each step of a behavior. A child's behavior is reinforced with a reward when he or she performs each of the steps correctly. Undesirable behaviors, or those that interfere with learning and social skills, are watched closely. The goal is to determine what happens to trigger a behavior, and what happens after that behavior that seems to reinforce the behavior. The idea is to remove these triggers and reinforcers from the child's environment. New reinforcers are then used to teach the child a different behavior in response to the same trigger.

Factsheet for Autism Therapy: Applied Behavior Analysis, HEALING THRESHOLDS (Nov. 5, 2009, last updated Dec. 21, 2009), http://autism.healingthresholds.com/therapy/applied-behavior-analysis-aba (footnotes and emphases omitted).

when P.H. would be in kindergarten -- and to formulate his IEP for that year.  Pls.' 56.1 Stmt. ¶ 5; Def.'s 56.1 Resp. ¶ 5.  The CSE comprised: (1) Giselle Jordan, a DOE representative and school psychologist who led the meeting; (2) P.H.'s SEIT; (3) a social worker; (4) a general education teacher; (5) a special education teacher; (6) P.H.'s parents; (7) an additional parent member of the CSE; and (8) the director of P.H.'s preschool program.  Pls.' 56.1 Stmt. ¶ 6.

Jordan, as CSE team leader, was ultimately responsible for preparing P.H.'s IEP.  Jordan had never met P.H.  She testified that she prepared the IEP by reviewing all of the records provided to her and participating in the CSE meeting.

Before the CSE meeting, P.H.'s parents provided the CSE with several documents, including: (1) a psycho-educational evaluation of P.H. and addendum prepared by Dr. David Salsberg, a supervising pediatric psychologist at NYU Medical Center, who treated P.H. privately; (2) P.H.'s speech, occupational, and physical therapy progress reports prepared by treating specialists; (3) an educational progress report from P.H.'s SEIT; (4) a social history update from a DOE social worker; (5) a classroom observation report by a different DOE social worker; and (6) a report prepared by P.H.'s pre-school teacher.  Jordan testified in the subsequent proceedings before the IHO that it

12

was her practice to review all submitted documents before the CSE meeting.

According to the documents submitted to the CSE, along with a public-school placement, P.H. received occupational therapy, speech therapy, ABA therapy, and physical therapy at home. He was making moderate progress with this combination of mainstream placement and private support. The SEIT's report stated that "[b]eing around typical peers [in the mainstream pre-school] ha[d] helped [P.H.] in his ability to communicate socially." Overall, P.H. had made "substantial progress throughout the year." M.H., Joint Appendix in Court of Appeals filed Oct. 13, 2010 ("M.H. J.A."), at 1185.

P.H.'s parents reported to the CSE that they thought he was "doing very well in his current mainstream placement and [was] flourishing with typical peers." Id. at 1192. Dr. Salsberg's report offered the view that P.H. should be placed in "a small classroom setting . . . [that] provide[s] frequent opportunities for social interaction with peers." Id. at 1144. Dr. Salsberg's initial report did not mention ABA therapy, but his addendum stated that P.H. "requires 1:1 intensive language-based behavioral interventions by an experienced SEIT throughout the day," and that P.H. "requires continuation of his home-based ABA, [occupational therapy,] and speech/language program." Id. at 1189. P.H.'s preschool teacher similarly opined that P.H.

13

required 1:1 support in order to function in the classroom setting. She thought, though, that the classroom setting was not "an appropriate place" for him. Id. at 1159.

As a result of the April 17 DOE CSE meeting, the CSE formulated an IEP for P.H. Pls.' 56.1 Stmt. ¶ 22; Def.'s 56.1 Resp. ¶ 22. Under the IEP, P.H. would be placed in a special school in a special education class with a 6:1:1 student-teacher-paraprofessional ratio. The IEP also provided for (1) twice weekly 30-minute physical therapy sessions; (2) thrice weekly 30-minute occupational therapy sessions; and (3) thrice weekly 30-minute speech and language therapy sessions. Under this IEP, P.H. would thus receive fewer hours of these related services than he had been receiving under the prior year's plan.

Based on the IEP, by Final Notice of Recommendation dated July 11, 2007, the School District notified P.H.'s parents that he had been placed at the school denominated P.S. 94, a smaller school located within the building of P.S. 15, on East 4th Street in Manhattan.[6]

---

[6] Both P.H.'s and D.S.'s Final Notices of Recommendation from DOE indicate that they were assigned to P.S. 94. But the schools appear to be located at different addresses and within different mainstream-schools. Although this is confusing, the confusion need not be resolved beyond noting that we find nothing to indicate that P.H. and D.S. would have attended the same school as one another had they both attended the public schools to which they were assigned in their IEPs.

The parties dispute what happened after parents M.H. and E.K. received the IEP and Final Notice of Recommendation. The plaintiff parents assert that "[f]or two weeks" they "attempted to contact the proposed placement to schedule a visit to determine whether the class was appropriate for P.H. There was no answer at the school building and the parent[s'] messages were not returned." Pls.' 56.1 Stmt. ¶ 28.

Thereafter, the parents say, they were directed to Ronnie Schuster, the principal at a different site, who, the parents were told, would be the principal at P.S. 94 in the fall. They assert that they visited Schuster's then-school on August 7 or 8, 2007, to observe a class similar to the one in which P.H. would be enrolled at P.S. 94 pursuant to his IEP. They met Oliva Cebrian, a teacher who was to be the site leader at P.S. 94. Cebrian took them to observe a 6:1:1 summer-program class that, she said, was similar to the class P.H. could expect to enter in the fall. Id. ¶ 30. In their view, the children in the class were lower functioning than P.H. and had "little expressive language." M.H. J.A. at 727. It appeared to M.H. that the teacher was only "babysitting" the children. Id. M.H. also contended that Cebrian told him that the mainstream children at the school did not act as though they welcomed special education children -- the latter group ate lunch in a separate cafeteria and used a separate entrance to the school.

15

After the visit, M.H. again contacted Schuster, seeking further information about the placement, including whether P.H. would be able to interact with mainstream students. Schuster referred him to another DOE employee, Sonia Royster, whom he then telephoned. When, according to M.H., Royster did not return the call, M.H. followed up by letter. According to M.H., Royster never responded.

At about the same time, M.H. and E.K., who were not yet persuaded that the IEP's placement was appropriate for their son, explored other options, including the Brooklyn Autism Center ("BAC"), a private school. The plaintiffs visited BAC and met with its educational director, Jaime Nicklas. BAC provides a program for autistic children that features intensive ABA 1:1 instruction to its five students; tuition is $80,000 per school year, payable at the beginning of each year.

After the visit, the parents submitted an application to BAC. M.H. testified that with the start of the school year fast approaching, his intention was "to place [P.H.] temporarily if they'll accept him into BAC in that program," while M.H. continued to seek information regarding the IEP's public school placement. M.H. J.A. 733. P.H. was accepted into BAC, and the plaintiffs signed the contract with the school and paid a deposit.

On August 24, 2007, one week after signing the BAC contract, M.H. visited Royster -- to whom Schuster had referred him -- at her office. According to M.H., Royster could not provide any further information about P.H.'s placement. M.H. asserts that he "literally had to camp out" at the CSE office "to get any information whether it be on [P.H.'s placement or] his related services." M.H. J.A. 736.

On the first day of school at P.S. 94 – September 10, 2007 – according to M.H., having failed to get any information from Royster, M.H. again contacted Schuster. When, he says, he did not receive a response, he followed up by email on September 14, inquiring whether he could visit the proposed placement. He did not receive a responsive email until nine days later, on September 19.

The next day, after observing two different classes at P.S. 94, M.H. was of the view that neither was an appropriate place for his son: In one, the students were young and, unlike P.H., nonverbal and not toilet trained; in the second, the students were many years P.H.'s senior. M.H. also thought that P.H. would not benefit from the instruction offered in the classes, both because the school offered only minimal ABA 1:1 therapy and because, M.H. thought, the methodologies the school did use would not work for P.H.

17

The DOE contends that it could have offered P.H. placement in yet a third class, but does not suggest that it so informed M.H. After visiting P.S. 94, the parents decided to keep P.H. at BAC for the 2007-08 school year, and paid the remainder of the $80,000 tuition in full.

By letter dated October 30, 2007, M.H. and E.K., through counsel, requested a due process "impartial hearing" and sought reimbursement for P.H.'s BAC tuition. In that request, they alleged that the DOE failed to provide P.H. with a FAPE, developing instead a procedurally and substantively unreasonable IEP.

The parents also asserted three specific procedural challenges to the IEP: (1) that the annual goals and short-term objectives presented for P.H. were "generic and vague," and lacked evaluative criteria, in violation of the IDEA; (2) that the CSE failed to conduct an Functional Behavioral Assessment ("FBA") to evaluate P.H.'s social needs; and (3) that the IEP ultimately did not mandate social and emotional counseling for P.H. despite acknowledging at one point in the document that such counseling was necessary. The plaintiffs also asserted that the IEP was substantively inadequate because the classrooms identified for P.H. did not meet his needs and would not have provided him with an educational benefit.

18

As is required under the IDEA, in response to the parents' request, a DOE IHO conducted a hearing to review the IEP.  The hearing lasted eight non-contiguous days between January 30, 2008, and September 5, 2008. M.H. J.A. 1345.

The DOE, which bore the burden of proof, presented testimony by: Giselle Jordan, the CSE organizer and drafter of the IEP; and Susan Cruz, an Assistant Principal at the proposed placement.  Id. at 1345-47.

Jordan testified, among other things, that she had reviewed all of the documents submitted to the CSE committee. She stated that P.H. did not demonstrate behavioral problems that interfered with his learning; described the CSE meeting and the process of producing the IEP; and discussed P.H.'s test scores. Cruz explained the structure and programming at P.S. 94.

Later, on rebuttal, the DOE also called Elizabeth Washburn, a teacher at P.S. 94, and Kay Cook, a "coach" who trains DOE staff on teaching methodologies for autistic students including ABA, TEACCH, and PECS, the latter being the principal methodologies used at P.S. 94.

The plaintiffs presented testimony by BAC director Jaime Nicklas; P.H.'s treating psychologist Dr. David Salsberg; P.H.'s speech pathologist Miranda White; and M.H., P.H.'s father. In addition to explaining BAC's program, Nicklas described the ABA methodology in depth and voiced her opinion that ABA is "the

only empirical method approved to treat children with autism." M.H. J.A. at 454. She admitted, however, that "a strict ABA program is not appropriate for every single child," and that higher functioning children would not benefit from being in a "more restrictive environment . . . if they can communicate and if they can learn in a large group setting." M.H. J.A. at 467. She also testified that based on her observation of P.H., it was clear to her that he needed an ABA program to progress. Finally, Nicklas testified that P.H. had made great strides during his time at BAC, learning to identify objects he wanted, asking for help, walking quietly, and identifying basic numbers and words, among other things. Dr. Salsberg's testimony focused on the importance of ABA treatment to P.H.'s continued progress.

After hearing the testimony, the IHO issued her findings and decision. She agreed with the parents that the IEP's annual goals and objectives were "generic and vague" and "not based on his actual needs and abilities, but on the grade he was expected to be placed in." M.H. J.A. at 1356. In support of this conclusion, the IHO cited Jordan's testimony to the effect that prior to the IEP meeting she thought P.H. would be entering first grade, and that, after learning that he would in fact be entering kindergarten, she changed the annual goals but did not change the short-term goals and objectives. Id. The IHO also agreed with the parents that "some of the April 2007 IEP annual

20

goals and short term objectives in reading comprehension, reading skills and math [were] not measurable since they d[id] not contain evaluative criteria, evaluation procedures and schedules to be used to measure progress."  Id.

The IHO then discussed her review as to the appropriate method for teaching P.H.  Although the parents did not specifically raise this issue in their letter requesting the hearing, the IHO characterized the parents as "contend[ing] that the appropriate methodology for the student was ABA discre[te] trial instruction."  Id. at 1357.  According to the IHO, P.H.'s "evaluations support their claim."  Id.  The IHO then decided that the IEP's proposed placement did not offer sufficient 1:1 ABA instruction, but that the BAC did.  Id.  Finally, the IHO concluded that because BAC was an appropriate place for P.H. and because equitable considerations favored the parents, reimbursement of P.H.'s BAC tuition costs was appropriate.  Id.

The DOE appealed the IHO's decision to the SRO.  On December 10, 2008, the SRO issued a decision reversing the IHO.  Id. at 1362.  After recounting the facts in some detail, the SRO addressed the DOE's contention that because the parents did not raise the question of educational methodology in their letter requesting the due process hearing, the IHO should not have considered it.  He concluded that in light of the parents' failure to include such a claim in their letter, it was

21

"procedurally improper for the [IHO] to bas[e] her finding that the district did not provide the student a FAPE in part on her determination that the appropriate methodology for [P.H.] was ABA." Id. at 1372. Turning to the merits, the SRO "f[ound] that the . . . annual academic goals [contained in the IEP] were appropriate for [P.H.] and that they provided meaningful guidance to the teacher responsible for implementing the goals." Id. at 1374.

With regard to the IEP's "non-academic goals," the SRO acknowledged that some of those contained in the IEP "lacked a written specified level of difficulty when isolated out of context and viewed alone," but thought that because "the majority of the student's short-term objectives were both detailed and measurable," this cured any deficiencies with the annual goals. Id. The SRO was also satisfied that the "IEP . . . contained sufficient goals and short-term objectives relating to [P.H.'s] social/emotional needs." Id. He also noted that "although not dispositive," the parents did not express any concern about the specificity of the IEP's goals until they filed their hearing request letter. Id. at 1375.

Turning to the substance of the program endorsed by the IEP, the SRO determined that although the parents "previously indicated that they believed [P.H.] was doing 'very well' in his mainstream preschool setting with SEIT support and they wanted

22

him to be placed in a similar setting for kindergarten, the hearing record does not support that a general education setting would be appropriate [for P.H.]." Id. (citation omitted). The SRO then cited testimony regarding P.S. 94's use of "various methodologies," and concluded that "the recommended placement was reasonably calculated to enable [P.H.] to obtain educational benefit." Id. The SRO thus decided that the IHO had "erred in [her] determination that the district did not offer [P.H.] a FAPE for the 2007-08 school year." Id. The SRO therefore did not reach the question of whether BAC was an appropriate unilateral placement.

M.H. and E.K., on behalf of P.H., challenged the SRO's decision through a civil action brought in the United States District Court for the Southern District of New York. By complaint dated April 9, 2009, the plaintiffs sought "(a) a modified de novo review and reversal of the . . . [SRO]'s December 10, 2008 Decision . . . ; (b) a determination that M.H. and E.K. and P.H. have met the applicable Second Circuit standard for reimbursement of tuition paid for the unilateral provision of special education services to P.H.; (c) an order directing defendant to reimburse plaintiff, as requested, for the provision of such educational services; and (d) an order granting plaintiff leave to file a fee application pursuant to the fee shifting provisions of the statute." Compl. at 2, M.H. v. N.Y.C. Dep't of

23

Educ., 712 F. Supp. 2d 125 (S.D.N.Y. 2010) (No. 09 Civ. 3657), ECF No. 1.

The parties then cross-moved for summary judgment. By a lengthy and detailed Opinion and Order dated May 10, 2010, the district court (Loretta A. Preska, Chief Judge) reversed the SRO, agreeing with the IHO instead. M.H. v. N.Y.C. Dep't of Educ., 712 F. Supp. 2d 125 (S.D.N.Y. 2010). After a careful rehearsal of the facts, the court engaged in a point-by-point consideration of the IHO's and SRO's decisions.

First, the district court decided that the SRO had erred by declining to consider the plaintiffs' evidence regarding the proper methodology for teaching their son. Id. at 148-52. In the district court's view, it was the DOE that first raised the issue of methodology. The plaintiffs could not fairly be precluded from responding. Id.

Second, the district court concluded that the IEP did not comply with IDEA's procedural requirements. In analyzing the issue, the court began with the observation that the opinion of the SRO was neither cogently reasoned nor supported by adequate evidence. The court therefore based its analysis on the reasoning and conclusions of the IHO. The district court thought them clear and in accordance with the applicable standards previously set forth by this Court. Id. at 153-63.

24

The district court did not, however, fault the CSE for its failure to conduct a Functional Behavioral Assessment. An FBA is the "process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment." NYCRR tit. 8, § 200.1®. The CSE did not conduct an FBA before adopting P.H.'s IEP. In P.H.'s case, an FBA would have considered why he engaged in abnormal behavior such as repeatedly biting his hand, screaming, and self-stimulating, or "stimming." Pls.' 56.1 Stmt. ¶¶ 15-16.

As the district court noted, "[f]ailure to conduct an FBA does not amount to a procedural violation of the IDEA where the IEP sets forth other means to address the student's problematic behaviors." Id. at 158. The court concluded that because the IEP identifies P.H.'s problematic behavior but states that it does not render him entirely unteachable, the SRO's determination that the absence of an FBA did not render the IEP unreasonable was appropriate. Id. at 159.

With regard to the IEP's substantive compliance with IDEA mandates, the district court relied on the IHO's opinion rather than that of the SRO. Id. at 159-66. The court agreed with the IHO's conclusion that the IEP did not provide a program that would meet P.H.'s needs. Id. The court also accepted the IHO's determination that the classroom identified for P.H. was not appropriate because it did not provide sufficient ABA

25

therapy.  Id. at 161-63.  Finally, the court agreed with the IHO that BAC was an appropriate unilateral placement, and that equitable considerations favored reimbursement.  Id. at 163-70.  The court therefore granted the plaintiffs' motion for summary judgment, denied the defendant's, and ordered the DOE to reimburse the plaintiffs for P.H.'s 2007-08 BAC tuition.  Id. at 170.

M.S. Background

M.S. and L.S.'s son, D.S., was diagnosed with an autism spectrum disorder -- more specifically, Pervasive Developmental Disorder -- when he was 17 months old.[7]  Immediately thereafter, D.S. began to receive services from the New York State Early Intervention program ("E.I."), including 20 hours per week of special education involving a combination of ABA and other therapy techniques.  M.S., Joint Appendix in Court of Appeals filed Oct. 29, 2010 ("M.S. J.A."), at 912.  He also received occupational and physical therapy.  Id.  Within a year it became clear that methodologies other than ABA were not working for D.S. His therapy was therefore increased to 30 hours of ABA each week.

_____

[7] Pervasive Developmental Disorder (Not Otherwise Specified) "became the diagnosis applied to children or adults who are on the autism spectrum but do not fully meet the criteria for another [autism-spectrum disorder] such as autistic disorder (sometimes called 'classic' autism) or Asperger Syndrome."  What is Autism?, Autism Speaks, http://www.autismspeaks.org/what-autism/pdd-nos (last visited, June 27, 2012).

26

By the time D.S. "aged out" of E.I., he was receiving 40 hours of ABA therapy with an SEIT, in addition to five hours per week of speech and occupational therapy and two hours per week of physical therapy, each of them in one-hour sessions. D.S. continued to receive this program by mandate of the CPSE. At four years old, D.S. was totally non-verbal, engaged in "extremely high rates of self-stimulatory behaviors," and displayed "distractible tendencies [that] profoundly interfere[d] with his learning and ability to attend to people and things in his environment." M.S. J.A. 234. In addition, he often put non-edible objects into his mouth.

Beginning with the 2007-08 school year, D.S. was considered by the CPSE to be a "school aged" child. He was therefore required to have an IEP created for him by a CSE -- a Committee on Special Education -- rather than an educational plan prescribed by the DOE's CPSE. In late May 2007, L.S., D.S.'s mother, was notified that the CSE would be meeting to consider the issue. L.S. telephoned Dr. Bowser, the district representative responsible for D.S.'s IEP, to schedule the meeting and offered to provide Dr. Bowser with evaluations of D.S. by his then-caregivers. Dr. Bowser informed L.S. that she could bring the evaluations to the CSE meeting rather than sending them to Bowser so that she could review them in preparation for the meeting.

27

The CSE convened a meeting on June 4, 2007, to discuss D.S.'s IEP for his kindergarten year. In attendance were, inter alios, (1) L.S.; (2) a special education teacher; (3) a general education teacher; and (4) Dr. Bowser. DOE evaluator Marion Pearl addressed the meeting by phone. The meeting lasted 45 minutes. At the beginning of the meeting, Dr. Bowser informed L.S. that although she had a right to have a parent member[8] present, no parent member was available to attend that day. According to L.S., Bowser appeared "quite stressed" about getting the IEP done by early June. L.S. therefore "felt pressured to have the meeting" even without a parent member present. M.S. J.A. 918. L.S. therefore signed a waiver agreeing to the absence of the parent member. Id.

The group received several written reports from D.S.'s educational service providers. D.S.'s occupational therapist reported that D.S.'s progress had been "extremely slow," and that "[i]t is essential that [D.S.] receive[] [occupational therapy] 5 times a week for at least 60 minutes in order to make adequate

---

[8] A "parent member" is a parent of another disabled child or a child who was recently "declassified" as disabled who participates in the CSE in order to ensure that the parents understand the IEP-formulation process, are "comfortable" with the IEP team's decisions, and have "had their concerns adequately addressed." Make a Difference. Become a Parent IEP Team Member, N.Y.C. DEP'T OF EDUC., http://schools.nyc.gov/Academics/SpecialEducation/when-is-the-next/parentTeamMember.htm (last visited June 27, 2012).

progress." M.S. J.A. 251. D.S.'s speech therapist wrote that as of that time, D.S. had "never spoken" and could "not effectively communicate pain or discomfort . . . [or] basic wants or needs." Id. at 247. She thought it to be "imperative that [D.S.] continue[s] to receive speech and language therapy for no [fewer] than [5] times weekly for [60] minute session to maintain and carryover learned skills thus far, and to help him to communicate spontaneously." Id.

D.S.'s physical therapist "recommended that [D.S.] continue to receive physical therapy services as per mandate" to continue his improvement. Id. at 249. The CSE group also received a report from DOE evaluator Pearl, who, according to L.S., recommended that D.S. be placed in an ABA program.

Jill Weynert, D.S.'s preschool program coordinator and a certified behavior analyst, expressed the view at the IHO hearing that D.S. "absolutely needed a one to one -- he needed an ABA program." Id. at 481. Weynert explained that D.S. "had a hard enough time learning with one to one," and that he "wouldn't be able to learn" in a group setting. Id. at 483-84. She also stated that unlike most children, D.S. would not benefit from being exposed to peers in a classroom environment because he could not "attend to other kids." Id. at 484.

According to Weynert, there was no discussion at the CSE meeting of D.S.'s progress over the previous year, or whether

29

he had achieved any of the annual or short-term goals that the CPSE had theretofore set out for him.  L.S. later testified before the DOE IHO that during the meeting, Bowser indicated that D.S. would be placed in a 6:1:1 program despite L.S.'s "expressed . . . concerns" about such a placement.  M.S. J.A. 921.  L.S. requested that the CSE consider programs like the one at the New York City Charter School of Autism, which provides 1:1 ABA therapy.  Spaces at the City School of Autism are allocated by lottery.  D.S. had not been chosen.  But L.S. hoped the DOE might be able to offer a similar program elsewhere.  Dr. Bowser informed L.S. that "all . . . she could offer at th[e] time . . . was a 6:1:1 placement, that was all that was available." Id.

Ultimately, D.S.'s IEP did not reflect his progress during the previous year or how that progress might call for altering goals for the subsequent year.  Instead, the team photocopied D.S.'s goals and objectives from the previous year's CPSE plan for use in the then-current year despite the fact that those goals and objectives were not only a year old, but had been drafted for the home-based 1:1 program D.S. was offered that year and were therefore, according to M.S. and L.S.'s arguments, inapplicable to the then-current year.

The CSE, led by Bowser, ultimately recommended in the IEP that they approved for D.S. that he attend a classroom-based

30

6:1:1 program in a District 75 school.[9]  The IEP noted that the committee had considered and rejected five other types of placements, including general education and a 12:1:1 special education class in a District 75 school.  The plan did not, however, reflect any consideration by the committee of a 1:1 ABA program.  The IEP also reduced D.S.'s related services, directing that he receive thirty minutes each of occupational, physical, and speech therapy, five times per week, and thirty minutes of counseling three times weekly.

After receiving a final notice of D.S.'s placement at P.S. 94 (part of P.S. 196)[10] in late-June 2007, L.S. visited the school, accompanied by Dr. Weynert.  For two hours, they observed the class to which D.S. would be assigned.  L.S. later reported that the class had only one non-verbal student, and that the book he used for communicating -- his PECS book[11] - stayed in his desk

---

[9]  District 75 "provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled.  District 75 consists of 56 school organizations, home and hospital instruction and vision and hearing services." Special Education District 75, http://schools.nyc.gov/Offices/District75/default.htm (last visited June 27, 2012).

[10] See supra note 6.

[11]  "Picture Exchange Communication System (PECS) is augmentative/alternative communication strategy for those who display little or no speech." http://www.pecsusa.com/research.php (last visited June 27, 2012); see also supra note 7.

the entire time she was there, leaving him with no way to communicate. L.S. also noted that although she had been told that the non-toilet-trained students in the class were brought to the bathroom every 30 minutes, she did not observe them being taken to the restroom at all in her two hours there.

L.S. also expressed concern that the teachers were not adequately trained, that the students' self-stimulatory behaviors went unchecked, and that D.S.'s "mouthing" behaviors -- i.e., his tendency to put anything and everything in his mouth -- were dangerous and would not be properly monitored at the school.

When L.S. raised these issues with P.S. 94's principal Ronnie Schuster, she agreed that "she in fact would be concerned for [D.S.'s] safety" there, particularly if he did not have a paraprofessional devoted to him throughout the day. M.S. J.A. at 936. Teachers at the school indicated that the school did provide ABA programs to some students, but these programs were not individualized and were offered in only part of the special education classroom. At the end of the visit, L.S. "felt strongly that I was in agreement with the experts, the professionals, the doctors, the educators, who had all -- all told me that" D.S. would not fare well in a 6:1:1 setting. Id. at 941.

In light of their discomfort, D.S.'s parents explored private school options for D.S., including the BAC. D.S. was

32

accepted to BAC and another specialized school. His parents chose to enroll him at BAC, which offers only ABA 1:1 teaching. They signed a contract with BAC pledging to pay the $80,000 tuition for the 2007-08 school year.

By letter dated December 28, 2007, the plaintiffs filed with the DOE a request for an impartial hearing. In the letter, the plaintiffs alleged that the DOE failed to provide D.S. a FAPE for the 2007-08 school year inasmuch as: (1) the CSE team was not properly constituted at the June 4, 2007, meeting at which the individualized education plan was developed, because it lacked a parent member, and the general education teacher was present for only part of the meeting; (2) the IEP failed to set new goals for D.S. for the relevant school year, instead photocopying his goals from the previous year, which had been developed for a 1:1 program and did not reflect D.S.'s progress during the prior year; (3) the IEP failed to explain why D.S.'s related services were reduced; and (4) the 6:1:1 program to which D.S. had been assigned could provide neither an appropriate peer group nor adequate supervision and instruction. The parents sought reimbursement for D.S.'s BAC tuition for that year.

The IHO convened a hearing comprising six hearing days between April 9, 2008, and October 8, 2008. At the hearing, the DOE called as witnesses: (1) Dr. Bowser; (2) Alex Campbell, a special education teacher who was in charge of the 6:1:1 class to

33

which the IEP had assigned D.S.; and (3) Susan Cruz, an assistant principal of P.S. 94, who testified generally about the school. Bowser was the DOE's principal witness. She testified that while she had not met or observed D.S., her review of his records convinced her that a general education setting was not appropriate for him. She stated that all parties present at the CSE meeting agreed with that assessment, and that the IEP therefore required specialized schooling with the addition of twelve months of related services.

Dr. Bowser endorsed the 6:1:1 placement, explaining that a small class size was required because D.S. "must be carefully supervised at all times during the day, because he [is] unaware of danger." M.S. J.A. at 55-56. However, Bowser later conceded that she did not know of any program other than 6:1:1 that the DOE could offer to autistic children, thereby implying that she did not consider whether a 1:1 program might be more appropriate. She further stated that the related services were all necessary, explaining that although D.S. would receive fewer hours of in-home services, he would be receiving similar services in the classroom setting, so that "in effect, he would be getting more services." Id. at 60.

Dr. Bowser conceded that the CSE team had incorporated goals for D.S. that had been photocopied from the prior year's plan, but stated that they had discussed "every goal," and

34

determined that each was still appropriate because it had not yet been met. Id. at 61. Dr. Bowser further stated that she had reviewed the evaluations from D.S.'s treating doctors and therapists, and that she agreed with most of them but disagreed with one doctor's recommendation that D.S. required attention seven days a week.

Alex Campbell, a special education teacher with seven years' experience and training in various methodologies including ABA, TEACCH, and PECS, also testified. Campbell, who would have been D.S.'s teacher had D.S. attended public school, testified that 6:1:1 learning can be appropriate for autistic children because it can provide them with both individualized attention and opportunities for group work. She said that there were four autistic children in her class in 2007-08, all of them around D.S.'s age, and that she maintained frequent and open communication with all the students' parents by phone and by notebook that was passed back and forth between school and home. She reported that all the students progressed over the course of the year.

The plaintiffs called several witnesses. Their first was Dr. Weynert, D.S.'s program coordinator from 2005-2007. According to Weynert, D.S. initially, in 2005, "presented . . . really no notable functional skills. He engaged in extremely high rates of self-stimulatory behaviors -- verbal and motor. He

35

was unable to . . . play with any toy in the way it was intended. . . . [A]ny object was used to engage in self-stimulatory behaviors." Id. at 471. She testified that D.S. "had the toughest time learning," but that after almost two years of intensive 1:1 ABA therapy for up to 35 hours a week, and many hours per week of related services, D.S. was able to "learn how to learn." Id. at 474. He nonetheless remained non-verbal and easily distracted, and continued to engage in high rates of self-stimulatory behavior. Weynert opined that 1:1 instruction was "absolutely" the proper course for D.S. Id. at 481.

Dr. Weynert also testified that at the June 2007 CSE meeting, the committee engaged in no discussion of methodology other than listening to Weynert's recommendation that D.S. be provided ABA 1:1 instruction. With regard to D.S.'s related services, Weynert testified that she "strongly, strongly advised against" the reduction of D.S.'s various therapies, but that the CSE told her that "[t]hat's [all] they could do." Id. at 493. Weynert explained that 30-minute sessions would be unproductive for D.S. because "to engage [him] takes some time. . . . And a half an hour, by the time you sat down with him and really began to do anything your session would be over." Id. at 494.

During her testimony, Weynert discussed the visit she and L.S. had made to P.S. 94 to observe the class to which D.S. had been assigned. She reported that the teacher had "minimal"

36

ABA training and that any ABA instruction was not tailored to the individual children. She reported that the assistant teacher was scolding a non-verbal child who was seeking attention rather than helping him communicate. Weynert said that no data was being collected on the children's behaviors and no "behavior reduction plans" were in place. Id. at 499-500. She further testified that she had visited BAC before D.S. enrolled there, and had been impressed with that program. Weynert did concede, however, that she had never observed D.S. himself in a BAC classroom.

The plaintiffs also called Jaime Nicklas, the BAC director who also testified in P.H.'s due process hearing. She explained that BAC offers full-time 1:1 ABA education to five autistic students each year. While she acknowledged that ABA is not the only methodology that can be used to educate children on the autistic spectrum, id. at 569, she stated that it was the most appropriate program for D.S. based on his "severe[]" autism and his need for "intensive one on one services." Id. at 572. Nicklas explained that during a typical day at BAC, D.S. would work with five different instructors who would rotate between the students to ensure that a child could generalize what he had learned. He had opportunities to interact with mainstreamed children during non-academic activities. BAC does not, however, offer related services such as speech therapy in school. Instead, the students receive those services at home. Id. at

37

608. Nicklas testified that D.S. has made "a lot of progress" at BAC; his speech, while challenging, "is coming along," and "his behaviors have gotten a lot better." Id. at 603. For example, D.S. now "walks with his hands in his pockets. His tapping behavior has decreased significantly"; "his awareness has seemed to increase." Id.

Finally, L.S., D.S.'s mother, testified. In addition to providing basic background information on D.S., she discussed her experiences at the CSE meeting and observing the proposed placement at P.S. 94. She said that at BAC, D.S. had continued to learn to communicate using an augmentative device called a Dyanvox, that his ability to identify shapes, items, and body parts had increased, and that his motor and play skills had improved.

By opinion dated October 22, 2008, the IHO rejected the plaintiffs' challenge, concluding that the DOE had offered D.S. a FAPE for the 2007-08 school year. As to the plaintiffs' procedural complaints, while the IHO acknowledged that some of the proceedings, including the DOE's practice of encouraging parents to waive the participation of a parent member, were troubling, the IHO thought that they did not rise to the level of the denial of a FAPE. The IHO further found that L.S. was provided sufficient opportunity to participate meaningfully in the CSE meeting, and that the limited involvement of the general

38

education teacher was not material in light of the agreement by all CSE members that general education was not appropriate for D.S.

The IHO was also untroubled by the IEP's wholesale importing of D.S.'s goals from the previous year. In the IHO's view, those goals remained appropriate in light of the testimony that D.S. learned very slowly.

As for the plaintiffs' objections to the substance of the IEP, the IHO concluded that the 6:1:1 class was "substantively appropriate and calculated for [D.S.] to make educational progress." M.S. v. N.Y.C. Dep't of Educ., Special Appendix ("M.S. S.P.A.") at 78. Specifically, the IHO cited Dr. Bowser's testimony explaining the rationale for placing D.S. in a 6:1:1 setting, including that it would "address[] a lot of the issues that were being brought up in the IEP," and would "enable [D.S.] to make some success, improve his skills, and get individualized assistance, with people who understand autism." Id. at 79. The IHO was persuaded that the CSE committee had "looked very carefully at [D.S.'s] need to be carefully supervised at all times," and had taken that into account in assigning him to a class with one teacher and one paraprofessional. Id.

With regard to the reduction in D.S.'s related services, the IHO noted that D.S. had received the IEP-authorized

39

services during the 2007-08 school year in the amounts specified in the IEP, and that L.S. testified that D.S. nonetheless had made progress. The IHO therefore concluded that the parents were "precluded from making the argument that the [related services] amount recommended [was] inappropriate." Id. at 83.

With regard to methodology, the IHO decided that although the people treating D.S. all recommended that he continue in 1:1 ABA, "the people who recommended it believed that it was the only methodology that worked and were not open to other approaches." Id. at 84. The IHO cited the testimony of Weynert and Nicklas to support this conclusion. Id. But the IHO also noted that an IEP "need not specify or provide one type of methodology," but that it "must provide for specialized instruction in the child's areas of need." Id. The IHO was satisfied that D.S.'s IEP met that requirement. Id. Finally, the IHO rejected the parents' argument that the P.S. 94 teachers were not "sufficiently trained and knowledgeable regarding [D.S.'s] needs." Id. at 85. The IHO concluded that the evidence amply supported the finding that the teachers were qualified.

For the foregoing reasons, the IHO denied the parents reimbursement for the $80,000 BAC tuition. Id.

The parents, M.S. and L.S., appealed the IHO's decision to an SRO. By decision dated January 9, 2009, the SRO dismissed the appeal. Id. at 65. After summarizing the factual and

40

procedural history at some length, the SRO briefly considered the parties' arguments.  He first addressed the IEP's alleged procedural defects, concluding that, "[b]ased on the hearing record and the particular facts before [him], and upon a complete and independent review of the hearing record, [he was] not persuaded that the [IHO] erred in finding . . . that the student was offered a FAPE for the 2007-08 school year." Id. at 65.  The SRO did not discuss any of the procedural or substantive arguments individually, instead rehearsing the language of the regulations implementing the IDEA and then stating that he "f[ound] no need to modify the [IHO's] decision." Id.  In light of this conclusion, the SRO, like the IHO, did not reach the question whether BAC was an appropriate unilateral placement. Id.

On May 8, 2009, the plaintiffs filed a complaint in the United States District Court for the Southern District of New York seeking review of the SRO's decision.  The district court judge to whom the case was assigned, Hon. Lewis A. Kaplan, referred the case to Magistrate Judge James C. Francis IV for further proceedings, including a Report and Recommendation on any dispositive motion. See Report & Recommendation, M.S. & L.S. v. N.Y.C. Dep't of Educ., 09 Civ. 4454 (LAK)(JCF) (S.D.N.Y. Mar. 12, 2010), ECF No. 25 ("R&R").  By motions filed on October 21, 2009, the parties cross-moved for summary judgment.

41

On March 12, 2010, the magistrate judge recommended that the district court deny the plaintiffs' motion and grant the DOE's, thereby leaving in place the IHO's findings that the DOE provided D.S. with a FAPE for 2007-08. R&R at 1. The magistrate judge set forth in the R&R a detailed factual history of the case, summarizing the testimony before the IHO. He then turned to the issue he thought dispositive: the degree of deference owed to administrative decision makers in IDEA cases. Id. at 34-35. He found this case to be indistinguishable from Grim for purposes of determining the standard-of-review. There, we concluded that the IDEA "strictly limit[s] judicial review of state administrative decisions." R&R at 34 (quoting Grim, 346 F.3d at 380-81). He noted Grim's instruction that "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers." Id. at 36 (quoting Grim, 346 F.3d at 382). With this in mind, the magistrate judge determined that he was required to defer "to administrative decisions on most issues relating to educational policy, whether or not they are controversial." Id. He said that although

> a court would be adept at determining if [the
> CSE] properly made [a determination about how
> to educate a child], . . . this Circuit
> leaves little room to analyze substantive
> deficiencies in the evidence presented by the
> DOE at the hearing. Instead, case law
> appears to indicate that as long a[s] the DOE

42

is able to produce an expert to support its position at a hearing and receives a positive determination by at least one of the administrative officers, the DOE's position is nearly assured victory in the federal courts.

Id. at 36-37 (citations omitted).  The magistrate judge "question[ed] whether the degree of deference to educational administrators required by Grim[] and other Second Circuit cases is consistent with the intent of Congress when it passed the IDEA," but concluded that he was "nonetheless bound by those decisions."  Id. at 41.

The magistrate judge then addressed the merits of the plaintiffs' arguments.  As for the plaintiffs' procedural challenges to the IEP, he noted that he was required to defer "to the determinations of the SRO and IHO regarding the prejudicial impact" of any procedural irregularities, id. at 43 (desribing Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007), aff'd, 293 F. App'x 20 (2d Cir. 2008)), even though he thought it "unclear why such deference is appropriate, given that determining procedural compliance with the IDEA does not appear to require expertise in the field of education," R&R at 43-44.

With regard to the composition of the CSE, the magistrate judge concluded that any error in urging L.S. to waive the presence of a parent member did not rise to the level of

43

denying D.S. a FAPE. Id. at 44-46. As for the parents' argument that "they were denied meaningful participation in the development of D.S.'s IEP because the CSE failed to rely on current evaluations of D.S.," id. at 46, he concluded that "[a]lthough the plaintiffs' claims . . . are troubling, they do not establish impermissible predetermination [of the IEP] in view of Dr. Bowser's testimony and the deference afforded SRO and IHO determinations under this Circuit's precedent," id. at 48.

On the last alleged procedural error, the incorporating of D.S.'s goals from the prior year into the 2007-08 IEP, the magistrate judge expressed "skepticism that all 22 pages of goals and short-term objectives were reviewed in the course of [the] 45-minute [CSE] meeting that was not solely focused on this information," but concluded that the court "[could not] disagree with the IHO's ultimate conclusion." Id. at 50.

Turning to the plaintiffs' challenge to the substantive adequacy of the IEP, the magistrate judge "agree[d] with the plaintiffs that it is doubtful that D.S.'s IEP was sufficiently individualized [and] . . . share[d] their concern that D.S. would not progress at P.S. 94." Id. at 54. He nevertheless thought himself "constrained to defer to the determination of the IHO and SRO" that the IEP was substantively appropriate, id. at 55, despite the testimony by "[t]hose who had met and evaluated [D.S., who] insisted that he required 1:1 ABA therapy in order to

44

progress." Id. at 54. In reluctantly reaching this conclusion, the magistrate judge wrote: "[I]t is curious that experts with experience working with the child at issue [i.e., D.S.'s examining doctors, therapists and SEIT instructor] do not receive similar deference" to the administrative review officers. Id. at 55.

The plaintiffs filed objections to the R&R. By order dated May 14, 2010, however, the district court adopted the R&R in its entirety. See Order, M.S. & L.S. v. N.Y.C. Dep't of Educ., 09 Civ. 4454 (LAK)(JCF) (S.D.N.Y. May 14, 2010), ECF. No. 32. The court noted that it "differ[ed] from the magistrate judge only as to the suggestion that he might have decided the matter differently but for feeling constrained by the degree of deference owed to administrative decisions in this context under established Second Circuit precedent." Id. In the district court's view, "[i]t [was] entirely unnecessary for [it] to express any view on that question." Id. The court therefore granted the defendant's motion for summary judgment.

**DISCUSSION**

**I.   Deference Owed to Administrative Findings**

"Our standard for reviewing a state's administrative decisions in IDEA cases is . . . well established." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009), cert denied, 130 S. Ct. 3277 (2010). "The responsibility for

45

determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. Their rulings are then subject to 'independent' judicial review." Walczak, 142 F.3d at 129. Nonetheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is 'circumscribed.'" Gagliardo, 489 F.3d at 112; see also Grim, 346 F.3d at 380-81 (interpreting the IDEA as "strictly limiting judicial review of state administrative decisions"). A reviewing court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" Gagliardo, 489 F.3d at 112; see also Rowley, 458 U.S. at 206. But such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

"To the contrary, federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Gagliardo, 489 F.3d at 113 (quoting Rowley, 458 U.S. at 206, 208) (brackets omitted); see also Walczak, 142 F.3d at 129 ("While federal courts do not simply rubber stamp administrative

46

decisions, they are expected to give 'due weight' to these proceedings . . . .") (citation omitted).  District courts are not to make "subjective credibility assessment[s]," and cannot "ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence."  Grim, 346 F.3d at 383.  As the Supreme Court has said, "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."  Rowley, 458 U.S. at 208.

Courts generally "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer."  A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist., 736 F.2d 873, 877 (2d Cir. 1984)) (internal quotation marks omitted).  "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight."  A.C., 553 F.3d at 171 (internal quotation marks omitted); see also Gagliardo, 489 F.3d at 114 n.2 (same).  "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful."  Walczak, 142 F.3d at 129.  The SRO's or IHO's factual findings must be "reasoned and supported by the record" to warrant

47

deference.  Gagliardo, 489 F.3d at 114.  And in our review of a district court's decision under the IDEA, deference to "administrative proceedings is particularly warranted where . . . the district court's decision was based solely on the administrative record."  A.C., 553 F.3d at 171.

These principles are more easily stated by appellate courts, even if at some length, than they are applied by district courts, as the cases before us illustrate.  The district court in M.H. repeatedly quoted to our language in Gagliardo that a state administrative finding does not merit deference unless it is "reasoned and supported by the record," 489 F.3d at 114.  See, e.g., M.H., 712 F. Supp. 2d at 154, 157, 161, 163.  The magistrate judge in M.S., by contrast, articulated a highly restricted standard of review, relying in particular on Grim to decide that "as long a[s] the DOE is able to produce an expert to support its position at a hearing and receives a positive determination by at least one of the administrative officers, the DOE's position is nearly assured victory in the federal courts." R&R at 37.

The Supreme Court has only considered the standard of review in these circumstances once.  In Rowley, the district court had held, contrary to New York school administrative officers whose decisions it was reviewing, that the child, a deaf student, had not been provided with a FAPE.  Rowley v. Bd. of

48

*Educ. of Hendrick Hudson Cent. Sch. Dist.*, 483 F. Supp. 528, 529 (S.D.N.Y. 1980). According to the district court, the school district had not given the student "an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children." *Id.* at 534. The Court of Appeals affirmed. *Rowley v. Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.*, 632 F.2d 945, 946 (2d Cir. 1980).

The Supreme Court reversed. It observed that "[n]oticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." *Rowley*, 458 U.S. at 189. In light of Congressionally expressed intent to provide disabled children with *some* educational opportunity, however, the Court concluded that the Act provided only for a "'basic floor of opportunity' . . . consist[ing] of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201.

The Court then considered the meaning of the provisions governing the district court's resolution of civil complaints brought under the Act. The parents had argued that the Act's reference to courts deciding issues based upon a preponderance of the evidence means that the Act requires "*de novo* review over state educational decisions and policies." *Id.* at 205. The

49

State countered that courts "are given only limited authority to review for state compliance with the Act's procedural requirements and no power to review the substance of the state program." Id.

The Supreme Court found neither view persuasive. Congress had substituted the "independent decision based on a preponderance of the evidence" language for "language that would have made state administrative findings conclusive if supported by substantial evidence." Id. at 205 (brackets omitted). Therefore, Congress clearly intended for courts to have some independent ability to review the decisions of administrative officers. Id. The fact that Congress had placed emphasis on the procedural protections afforded parents and children, however, "demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Id. at 206. For this reason, "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation . . . to substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Id.

The Rowley Court continued: "The fact that [the IDEA] requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied

50

requirement that due weight shall be given to these proceedings."

Id. (second alteration in original).

> Congress' intention was not that the Act
> displace the primacy of States in the field
> of education, but that States receive funds
> to assist them in extending their educational
> systems to the handicapped.  Therefore, once
> a court determines that the requirements of
> the Act have been met, questions of
> methodology are for resolution by the States.

Id. at 208.

With this framework in place, the Court decided that review should proceed on two levels:  First, the district court should ask whether the State has complied with the "procedures set forth by the act."  Id. at 206.  And, second, the court should decide whether "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits."  Id. at 206-07.

Rowley left many issues unresolved, including:  How much weight is "due" to the administrative rulings?  Is there a difference between administrative rulings that appear grounded in findings of fact and those based on conclusions of law?  Is there a different level of deference owed to questions of procedural compliance as opposed to substantive compliance?  And how should courts treat a question of appropriate educational methodology

that is bound up with a determination of whether the requirements of the Act have been met?

In Walczak, we considered a district court's decision, contrary to the determinations of state and local administrative officers, that the school district had not provided an IEP that was adequate to permit the disabled child to "make educational and social progress." Walczak, 142 F.3d at 123. We sought to determine how a federal court could conduct an "independent" review pursuant to the IDEA without "impermissibly meddling in state educational methodology." Id. at 130 (internal quotation marks omitted). We concluded that at least in cases where the substantive adequacy of the IEP is challenged, the district court's review is limited to an examination of "'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." Id. In Walczak there was no objective evidence that the student had regressed, but there was clear evidence of achievement, including her advancement to a higher-level mathematics workbook. Id. at 131; see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006) (applying "objective evidence" standard to determine whether a parent's placement of a child in private school was appropriate), cert. denied, 552 U.S. 985 (2007). There was, therefore, insufficient evidence to support the district court's rejection of the administrative findings.

In Grim we considered the district court's determination that two IEPs developed for a student in two successive school years were substantively and procedurally flawed. Grim, 346 F.3d at 380. First, we observed that Rowley's requirement that courts give "due weight" to administrative bodies implementing the statute applied to both "substantive" and "procedural" challenges. Id. at 382-83. Then we concluded that the district court had not applied the proper standard of review in rejecting the IHO's and SRO's findings that the IEPs were appropriate.

> [The district court] justified its conclusion by finding that '[n]either the IHO nor the SRO [reviewing the . . . IEPs] gave appropriate consideration to the experts on dyslexia, who had personal knowledge of the student in question.' Accordingly, in violation of Rowley, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy -- effective methods of educating dyslexic students -- in direct contradiction of the opinions of state administrative officers who had heard the same evidence.

Id. at 383 (citation omitted; second and third brackets in original). We therefore decided that a district court must defer to administrative determinations involving educational methodology even where they address the question of whether the state has provided the student with the basic floor of opportunity that the Act requires. Id.

In Gagliardo, we considered a district court's conclusion that the school district's placement of a child in a private school was inappropriate even though state administrative officers had deemed it appropriate. Gagliardo, 489 F.3d at 106-07. The district court had based its determination on one expert's statement that the child needed a school setting that was "therapeutic or supportive," even though that same expert had later explained that the "thrust of his recommendation . . . was that [the child] be placed in a school where trained professionals could work closely with him and assist him as issues associated with his disorder surfaced throughout the day." Id. at 114 (emphasis omitted). We thought that reasoning to be flawed. Id. Although the district court had addressed the interpretation of the meaning of expert testimony, as opposed to a dispute over methodology, we nonetheless concluded that the district court owed the findings of the administrative hearing officer deference. The officer had considered the testimony and issued a decision that was "reasoned and supported by the record." Id. It therefore should not have been disturbed by the district court. Id.

The parties and amici urge us to articulate a bright-line standard to be applied by district courts in reviewing state administrative decisionmaking in IDEA cases. See, e.g., M.H., Council of Parent Attys. & Advocates Amicus Br. 5 (suggesting

that the court should "(1) review legal conclusions of administrative decisions <u>de novo</u> without giving due weight to the administrative decisions; (2) review mixed questions of law and fact, such as whether the school district offered a FAPE, <u>de novo</u> without giving due weight to the administrative decisions; (3) give due weight to the factual findings of the administrative decisions that are supported by the preponderance of the evidence; and (4) defer to the educational policies recommended by school officials if the court determine[s] that [the] school district complied with the requirements of the Act"). <u>Rowley</u> and subsequent decisions of this Court favor a different approach, however.

<u>Rowley</u> left unresolved the question of the weight due administrative determinations because that weight will vary based on the type of determination at issue. Pursuant to statute, the district court must base its decision on "the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(iii). This analysis is complicated, though, by the fact that it occurs in the context of a complex statutory scheme involving institutional actors at different levels and within different branches of state and federal government.

As the First Circuit has explained, the standard for reviewing administrative determinations "requires a more critical appraisal of the agency determination than clear-error

review . . . but . . . nevertheless[] falls well short of complete de novo review. . . . [I]n the course of th[is] oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87 (1st Cir. 1993) (internal citations omitted).

We agree. In many determinations made by administrative officers, the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court. But the district court's determination of the persuasiveness of an administrative finding must also be colored by an accute awareness of institutional competence and role. As the Supreme Court made clear in Rowley, the purpose of the IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional role in educating their residents. Rowley, 458 U.S. at 208 n.30; cf. Schaffer, 546 U.S. at 53 ("The core of the statute. . . is the cooperative process that it establishes between parents and schools."). In policing the states' adjudication of IDEA matters, the courts are required

to remain conscious of these considerations in determining the weight due any particular administrative finding.

By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. See Cerra, 427 F.3d at 195. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Compare Grim, 346 F.3d at 382-83, with Walczak, 142 F.3d at 130. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. See id. at 129. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

**II. Issues for Judicial Review**

The "IDEA established a two-part inquiry for courts reviewing [state] administrative determinations" under the IDEA. Grim, 346 F.3d at 381. First, the court asks whether "the State complied with the procedures set forth in the Act." Id. Second, the court asks whether the IEP "developed through the Act's procedures [is] reasonably calculated to enable the child

57

to receive educational benefits." Id. (quoting Rowley, 458 U.S. at 206-07). If an IEP is deficient -- either procedurally or substantively -- the court then asks "whether the private schooling obtained by the parents [for the child] is appropriate to the child's needs." T.P., 554 F.3d at 252. In answering this third question, "equitable considerations relating to the reasonableness of the action taken by the parents are relevant." Id. (alteration and internal quotation marks omitted).

A. Procedural Compliance

"The initial procedural inquiry is no mere formality." Walczak, 142 F.3d at 129. It acts as "'a safeguard against arbitrary or erroneous decisionmaking.'" Evans v. Bd. of Educ. of Rhinebeck Cent. Sch. Dist., 930 F. Supp. 83, 93 (S.D.N.Y. 1996) (quoting Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1041 (5th Cir. 1989)). Of course, not every procedural error will render an IEP legally inadequate. Grim, 346 F.3d at 381-82. Relief is warranted only if the alleged procedural inadequacies "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits," 20 U.S.C. § 1415(f)(3)(E)(ii).

Under the IDEA and its implementing regulations, an IEP must contain: (1) the student's present levels of academic

58

achievement and functional performance; (2) measurable annual goals for the child; (3) the method used to measure the student's progress toward those goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with "nondisabled" peers; (6) the reasons for any alternate assessments; and (7) the start date for recommended services, their duration, and their frequency.  20 U.S.C. § 1414(d)(1)(A); 8 NYCRR tit. 8 § 200.4(d)(2).

Specifically with respect to the goals that must be included in any IEP, the IDEA and its regulations require that the IEP include short-term and long-term academic and non-academic goals for each student, as well as evaluative procedures for measuring a student's progress in achieving the short- and long-term goals contained in the IEP.  See 20 U.S.C. § 1414(d)(1)(A)(i)(III) (directing that IEP include "a description of how the child's progress toward meeting the annual goals . . . will be measured"); 34 C.F.R. § 300.320(a)(2)-(3); NYCRR tit. 8, § 200.4(d)(2)(ii).

B.   Substantive Compliance

The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP. The "'appropriate' education" mandated by IDEA does not require states to "maximize the potential of handicapped children."

*Rowley*, 458 U.S. at 189-90, 196 n. 21. (quotation marks omitted). The purpose of the Act was instead "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192; accord *Walczak*, 142 F.3d at 130; *Lunceford v. Dist. of Columbia Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ruth Bader Ginsburg, then-*Judge*)(because public "resources are not infinite," federal law "does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each [disabled] child." (emphasis omitted)).

C.   Appropriateness of Alternative Placement

Parents who think that the state has failed to provide their child with a FAPE as required under the IDEA, 20 U.S.C. § 1412(a)(1)(A), may pay for private services and seek reimbursement from the school district for "'expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP.'"  *T.P.*, 554 F.3d at 252 (quoting *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370-71 (1985)).

In making a claim for reimbursement, "the burden shifts to the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate." *Gagliardo*, 489 F.3d at 112.  The educational program at the alternative

placement must be "reasonably calculated to enable the child to receive educational benefit." Id. (quotation marks omitted). However, "even where there is evidence of success [in the private placement], courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of . . . advantages . . . that might be preferred by parents of any child, disabled or not." Gagliardo, 489 F.3d at 115. Rather, the "unilateral private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child." Id. (emphasis in original; quotation marks omitted).

**III.  Analysis of Claims in M.H.**

A. Prefatory Observation

The district court in M.H. had before it the conclusions of two different administrative officers, the IHO and the SRO, who came to opposite conclusions as to the procedural and substantive adequacy of the IEP at issue. In following Grim's instruction as to the deference owed to such administrative decisions by the court because of the administrators' "expertise" in such matters, Grim, 346 F.3d at 382, the district court thus had available to it sharply conflicting administrative views. As we will see, in reviewing the SRO's decision, the court often relied on the carefully articulated contrary observations, insights, and conclusions of

the IHO.  We think that to have been entirely proper.  See A.C., 553 F.3d at 171.

Where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination.  However, when (as here) the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.

B.  Procedural Compliance

The district court in M.H. concluded that the IEP was procedurally deficient in its formulation of goals for P.H. because the "annual academic goals and objectives stated on P.H.'s IEP are based on P.H.'s expected grade level and not on his actual needs and abilities."  M.H, 712 F. Supp. 2d. at 155. In so concluding, the court deferred to the IHO's determination,

62

but declined to defer to the SRO's findings to the contrary because they were not, in the district court's opinion, "thorough and careful." Id. at 162 (internal quotation marks omitted). Although the IHO based her decision on both the annual academic goals and the short-term non-academic objectives reflected by the IEP, the SRO addressed only the annual academic goals.

The district court elaborated:

[t]he upshot of the IHO's determination is that the short-term objectives were generic because they were not modified to reflect the change in the grade level on P.H.'s annual goals. By reversing only on the basis that the annual goals were not generic, the SRO failed to consider the IHO's more important finding that the short-term objectives were generic.

Id. at 154. In the district court's view, "the substance of the short-term objectives was necessarily central to the IHO's decision" that the IEP was procedurally flawed. Id.

The district court also found wanting the IEP's short-term objectives, the "vast majority" of which lack "measurement statement[s]" by which evaluators could track P.H.'s progress. Id. at 156. The court again declined to defer to the SRO, who was satisfied with the short-term objectives, because "the SRO failed to address the measurability of P.H.'s academic goals, which formed the entire basis for the IHO's conclusion." Id. (emphasis in original). The SRO based his conclusion instead on "'a review of P.H.'s non-academic goals,' and 'goals and short-

63

term objectives relating to P.H.'s social/emotional needs.'" Id. at 156-57 (brackets omitted; emphases in original). The district court concluded that the IHO's decision, which found the short-term objectives to be deficient, rather than the SRO's, merited deference because it was "reasoned and supported by the record." Id. at 157 (quoting Gagliardo, 489 F.3d at 114).

The district court also adopted the IHO's conclusion -- based on a specific factual finding -- that the non-academic goals contained in the IEP were too advanced for P.H., declining to defer to the SRO's "conclusory" reversal of the IHO on this point. Id. at 158. The SRO had stated only that the goals "'comprehensively addressed [P.H.'s] needs in'" the relevant areas. Id. (quoting IHO report).

The district court rejected the plaintiffs' challenges to the adequacy of the IEP's evaluative schedule for academic and non-academic goals, and the evaluative criteria for P.H.'s short-term objectives, concluding that the SRO's findings on these points were "entitled to deference." Id. at 156.

The DOE argues that the IEP team "formulated appropriate annual goals and objectives" for P.H., "along with detailed short-term goals," and, further, that even if the goals were not appropriate, they "could be reviewed and, if needed, adjusted throughout the approaching school year." M.H. Appellant's Br. 47. The DOE also points out that the IEP

64

contained thirteen pages of annual goals and short term objectives, contending that they were "reflective of [P.H.'s] needs and thus would have provided appropriate benchmarks for [him] in the 2007-2008 school year."  Id. at 49.

The parents respond that the IEP's goals for P.H. were not individualized because they were crafted with a rising first-grader in mind; they were not changed when Ms. Jordan learned that P.H. was in fact entering kindergarten.  M.H. Appellee's Br. 14-15.  The plaintiffs further argue that the district court was not required to defer to the SRO because the SRO's conclusions were "unsupported by the record as a whole and incorrect as a matter of law . . . ."  Id. at 39 (internal quotation marks omitted).

The district court's decision to disagree with the SRO was proper.  This was not a situation in which the court credited the conclusions that were most consistent with its own subjective analysis.  See, e.g., W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of The Sch. Dist of N.Y.C., 716 F. Supp. 2d 270, 289 (S.D.N.Y. 2010) ("In light of the uncontradicted testimony, . . . the SRO's finding . . . is entitled to deference."); Connor ex rel. I.C. v. N.Y.C. Dep't of Educ., No. 08-cv-7710-LBS, 2009 WL 3335760, at *4, 2009 U.S. Dist. LEXIS 98605, at *14 (S.D.N.Y. Oct. 13, 2009) (deferring to the SRO on a procedural issue where "nothing in the record suggests any reason to diverge" from the SRO's

determination).  Rather, the court assessed whether the SRO's conclusions were grounded in a "thorough and careful" analysis. Walczak, 142 F.3d at 129.  The court rejected them only when it found that they were not supported by a preponderance of the objective evidence.

With respect to the IEP goals not being individualized, the IHO noted that CSE coordinator Giselle Jordan herself testified that she wrote the goals with a rising first-grader in mind and did not alter them once she learned P.H. should be starting kindergarten.  On the other hand, the SRO noted only that P.H.'s Bracken Score (one of many evaluative tools) was within the average range for his age, and therefore drew the conclusion that any goals listed as appropriate to kindergartners must have been appropriate for P.H.

The district court thought the SRO's conclusion to be poorly reasoned.  We agree.  There does not appear to be any doubt that kindergarten level goals were appropriate for P.H.  To be sure, when Ms. Jordan learned at the CSE meeting that P.H. was entering kindergarten, she crossed out "1st grade" and changed it to "kindergarten" for all of P.H.'s annual academic goals.  The question is whether, because Jordan did not also alter the short-term objectives to make them appropriate for kindergarten instead of first grade, the IEP's short-term academic objectives were inappropriate.  See, e.g., M.H. J.A. 1214 (annual goals and

66

short-term objectives).  The SRO ignored this issue despite the fact that it was the linchpin of the IHO's conclusion that the academic goals in the IEP were insufficiently individualized to P.H. and did not accurately reflect his special education needs. M.H., 712 F. Supp. 2d at 154.

The IHO's conclusions were further supported by testimony from Nicklas that the short-term goals for P.H. were unattainable.  She pointed out, for example, that P.H. was reading one word at a time, and that he would thus be unable to meet short-term objectives such as "distinguish[ing] between fact and fiction,"  "predict[ing] outcomes," and "identify[ing] the effect of a certain action."  M.H. J.A. 511.  In light of the IHO's thorough analysis on this point and the SRO's failure to consider it, the district court did not err.

With regard to the measurability of the IEP's goals, the SRO focused on non-academic ones including the "student's needs in [occupational therapy, physical therapy], speech-language therapy, social interaction, play, communication and socialization, and adaptive physical education," concluding that although the annual goals lacked specificity, the short-term goals were sufficiently "detailed and measurable," and that they "cured any deficiencies in the annual goals."  Id. at 1374.  The SRO cited several of the short-term objectives in the IEP, which contained either phrases like "teacher observation" to indicate

67

how the observer is to measure P.H.'s progress.  Id.; see also id. at 1211-13 (pages from the IEP).  As the district court noted, however, the SRO ignored the fact that the "vast majority of objectives in the IEP . . . do not contain any such measurement statement."  M.H., 712 F. Supp. 2d at 156; id. at 156-57 (stating that "only 17 of the IEP's 85 short-term objectives contain an evaluation procedure, and, most importantly, not one of the academic short-term objectives mentions an evaluation procedure.") (emphasis added).

New York State regulations require an IEP to specify "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal."  NYCRR tit. 8, § 200.4(d)(2)(iii)(b).  Any short-term objective must also be "measurable."  Id. at § 200.4(d)(2)(c)(iv).

We agree with the district court's decision not to defer to the SRO's determination that the IEP provided sufficient evaluation procedures for the IEP's goals and objectives.  The SRO failed to consider P.H.'s short-term academic objectives at all beyond a conclusory view that all of the "79 short-term objectives" addressed the "student's needs" and that the "majority of the . . . short-term objectives were both detailed and measurable," M.H. J.A. 1374 (emphasis added).  He only provided a detailed analysis of the "short-term objectives relating to the student's social/emotional needs."  Id.  And

68

although the SRO stated that many of the short-term non-academic goals "could be observed and measured," in reviewing the more than eighty short-term objectives referred to in the IEP, only fifteen expressly referred to "teacher observation" as an evaluation procedure. None of the academic short-term objectives had any express evaluation procedure.

We also agree with the district court's decision to rely on the IHO's conclusion that the non-academic goals were not suited to P.H.'s needs and that some were too advanced for P.H. That decision is supported by the evidence in the record, including the testimony of Dr. Nicklas and M.H. The SRO, on the other hand, did no more than state summarily that the goals "comprehensively addressed the student's needs in th[e] areas." M.H. J.A. 1374. The SRO failed to point to contrary evidence that he deemed more compelling. Had he done so, the district court might have properly deferred to the SRO's analysis of the IEP's goals and objectives. But the SRO's conclusory statement does not evince thorough and well-reasoned analysis that would require deference.

We therefore affirm the district court's conclusion that the IEP did not comply with the procedural requirements of the IDEA and that P.H. was denied a FAPE as a result.

69

## C.    Substantive Adequacy

### 1.    Methodology Evidence

The IEP's substantive compliance with the IDEA depends on a threshold issue upon which the IHO and the SRO disagreed: whether the reviewing officers could consider the evidence related to the various methodologies for teaching autistic children, including ABA and TEACCH.  A parent of a disabled child initiates the impartial review process by filing a notice including "complaint[s] . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child."  20 U.S.C. § 1415(b)(6)(A).  The IDEA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).

The plaintiffs do not dispute that they did not raise the issue of teaching methodologies in the impartial hearing request.  However, the IHO did consider the question in issuing her opinion.  And much of the testimony presented by both parties to the IHO related to the question of whether ABA or TEACCH was better for P.H.  The SRO determined that the IHO should not have considered the issue, because the plaintiffs had waived it by omitting the discussion from their hearing request.  M.H. J.A.

70

1372-73 ("[T]he impartial hearing officer exceeded her jurisdiction in making a determination which was not properly before her.").

The district court disagreed. M.H., 712 F. Supp. 2d at 151-52. The court noted that at the hearing before the IHO, it was the DOE that introduced the issue of methodology -- first in its opening statement, and then in the questioning of its first witness, Ms. Jordan. Id. at 149. The court therefore decided that the plaintiffs could not "fairly be barred from rebutting [the DOE's] testimony with evidence of the appropriateness of [the] methodologies, and the DOE [could not] genuinely claim that it was prejudiced by the IHO's consideration of such evidence." Id. at 150.

The DOE appeals from the district court's conclusion on this point, arguing that the concept of "opening the door," upon which the district court relied, is inapplicable in the context of IDEA due process hearings. It submits that the concept "should not be confused with a jurisdictional limitation, or with a statutory requirement for the consent of the opposing party." M.H. Appellant's Br. 57. The DOE further contends that it did no more than "[s]ubmit[] evidence that [was] relevant to an issue properly before the hearing officer," viz., the appropriateness of the IEP's recommended placement. Id. at 56. The DOE contends that it never agreed to submit the "different issue" of whether

71

only the ABA methodology was appropriate for P.H. to the IHO. Id. (emphasis in original). The DOE suggests that it should have been able to elicit evidence regarding the teaching methodologies because such evidence was relevant to demonstrating that the 6:1:1 placement provided to P.H. was appropriate to his needs, but that the parents should not have been able to submit their own evidence that only ABA instruction would be effective for P.H.

We agree with the district court and the parents that it would be unfair to permit the DOE to argue that its recommended placement for P.H. was appropriate because it offered "various teaching methods," and that the parents' placement was inappropriate because it "offers [only] one type of intervention, . . . which is [ABA]," M.H. J.A. 27-29, but then to bar the parents from contending that the schooling offered in the IEP was inappropriate for P.H. precisely because it offered "various" methodologies, most of which would not work for their son.

In other words, it does not follow from the fact that the DOE bears the burden of demonstrating that the IEP provides a FAPE that it should be permitted to argue issues outside the scope of the due process complaint without "opening the door" for the plaintiffs. The parents, in their complaint letter, challenged the substantive sufficiency of the IEP offered to their son. The DOE chose to respond by arguing that the IEP's

72

placement was better in part because it utilized multiple methodologies. In these circumstances, the statute does not bar the parents from contesting the appropriateness of the methodologies offered in the IEP's recommended program.

                    2.    The Substance of the IEP

The SRO and IHO disagreed on the substantive sufficiency of the IEP. The IHO concluded that the IEP failed to provide a FAPE because the IEP recommended very little ABA therapy, which had been shown by testimony at the hearing to be "imperative. . . to prevent [P.H.'s] regression." M.H. J.A. 1357. After excluding the parents' methodology evidence, the SRO reversed the IHO, concluding that the 6:1:1 program "was appropriate to meet the needs of [P.H.]." M.H. J.A. 1375. But the SRO compared the IEP-recommended program only to general education; he did not explain why it was more appropriate than either 12:1:1 instruction, which the DOE offers, or 1:1 instruction.

The district court again declined to defer to the SRO. The court observed that although the SRO excluded the parents' methodology evidence, which, in the district court's words, "tended to show that P.H. required a methodology employing a 1:1 student-teacher ratio," M.H., 712 F. Supp. 2d at 161, the SRO had considered "the DOE's methodology evidence tending to show that the methodologies available within a 6:1:1 program were

73

affirmatively appropriate for P.H.," id. The court then stated that the IHO had considered "not only the same evidence that the SRO considered but also the substantial amount of methodology evidence introduced by Plaintiffs." Id. The court deferred to the IHO, not the SRO, "find[ing] no reason to disagree with her decision, particularly because she considered all the evidence presented to her and because the weights she assigned to conflicting evidence were undoubtedly influenced by her educational expertise." Id. (citing Grim, 346 F.3d at 382). The court concluded by opining that "[t]he SRO's decision would have merited such deference had it included consideration of all the evidence in the record." Id.

The DOE contends that "even if the methodology allegation had been properly presented in the complaint letter, the IHO should not have considered it," because "decisions regarding the best methodology to utilize in teaching special education students . . . should be made by teachers, not by the courts." M.H. Appellant's Br. 59 (citing Rowley, 458 U.S. at 207, 210). According to the DOE, administrative officers and courts are limited to deciding the issue of "whether the placement provided the student an appropriate FAPE, not whether the methodology offered in the school the parents preferred was superior to that offered in the public school." Id. at 59-60.

The parents reply that the DOE mistakenly "attempts to separate the _method_ of instruction from the _appropriateness_ of that instruction."  M.H. Appellee's Br. 35.  They argue that the IDEA "expressly permits courts to consider the 'content, methodology, [and] delivery of instruction['] to determine whether a FAPE has been offered to a child with special needs," _id._ at 38 (quoting 34 C.F.R. § 300.39(a)(1), although the quoted text is in § 300.39(b)(3), as part of the definition of "specially designed instruction") (alterations in original).  The parents also contend that the 6:1:1 program recommended in the IEP was not appropriate for P.H. both because even though it was within a mainstream school building, it actually provided fewer opportunities to interact with mainstream peers than BAC (even as an institution specializing in educating children with autism), and because the testimony and reports by all of P.H.'s treating doctors and by his SEIT indicated that he could not learn successfully in a 6:1:1 environment.

We agree with the district court that the SRO's decision, which took only the DOE's evidence into account, does not warrant deference in this regard.  The IHO's discussion of the substantive adequacy of the IEP, while brief, clearly explained that the IHO concluded that the key failing of the IEP was its failure to account for Dr. Salsberg's report -- dated two months before the relevant hearing of the CSE -- that P.H.

75

required intensive 1:1 instruction.  Although courts should generally defer to the state administrative hearing officers concerning matters of methodology, the SRO's failure to consider any of the evidence regarding the ABA methodology and its propriety for P.H. is more than an error in the analysis of proper educational methodology.  It is a failure to consider highly significant evidence in the record.  This is precisely the type of determination to which courts need not defer, particularly when the evidence has been carefully considered and found persuasive by an IHO.

D.    Appropriateness of the Unilateral Placement

Once it is determined that the program offered by an IEP will not "enable the child to receive educational benefits," Cerra, 427 F.3d at 192 (quotation marks omitted), the burden shifts to the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate. Gagliardo, 489 F.3d at 112.  Although their unilateral placement need not "meet the IDEA definition of a [FAPE]," Frank G., 459 F.3d at 364, as would a program provided by the public school system, it must be "reasonably calculated to enable the child to receive educational benefits," id. (quotation marks omitted). However, "even where there is evidence of success [in the private placement], courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school

76

are the kind of . . . advantages . . . that might be preferred by parents of any child, disabled or not." Gagliardo, 489 F.3d at 115. Rather, the "unilateral private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child." Id. (emphasis in original; quotation marks omitted).

In this case, the SRO did not reach the question of the appropriateness of BAC as a private placement for P.H. M.H. J.A. 1376. The district court therefore deferred to the IHO, whose conclusions the court found to be "well reasoned and supported by the evidence." M.H., 712 F. Supp. 2d at 165. The IHO was satisfied that the parents had shown that BAC met P.H.'s needs. She relied on, inter alia, the testimony of BAC director Nicklas and on the data provided by BAC documenting P.H.'s progress. In confirming the IHO's opinion, the district court also rejected the DOE's three reasons for deciding that BAC "should be considered inappropriate for P.H." M.H., 712 F. Supp. 2d at 164.

First, the DOE argued that the BAC records showed that "BAC was not actually addressing P.H.'s deficits," specifically his handwriting and gross-motor-skills lessons. Id. The district court noted that Nicklas's and Jordan's testimony contradicted each other on this point, and that it was for the IHO to weigh the credibility of each expert's testimony. Id.

77

Second, the DOE argued that BAC was too restrictive because P.H. was not educated with mainstream peers. Id. at 165 (citing, inter alia, P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ. (Newington), 546 F.3d 111, 120 (2d Cir. 2008)). Under the Newington test, when evaluating whether a student's placement is the least restrictive environment possible, as required by the IDEA, "a court should consider, first, whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily . . . , and, if not, then whether the school has mainstreamed the child to the maximum extent appropriate." Newington, 546 F.3d at 120 (quotation marks omitted). The district court noted that the parties agreed that P.H. "would not have benefi[t]ted from placement in a regular classroom." M.H., 712 F. Supp. 2d at 165. Citing the IHO's "well reasoned" conclusion that "discrete-trial ABA was the appropriate methodology for educating P.H.," the court deferred to the IHO's finding that BAC was not too restrictive for P.H. Id.

Third, the district court rejected the DOE's argument that BAC was inappropriate because the school did not provide related services on-site, relying upon the IHO's conclusion to that effect and upon the fact that "parents are entitled to more flexibility in their choice of placement than [is] the DOE." Id.

at 166.  The court also noted that the IHO had considered and rejected precisely the same argument.  Id.

The DOE contends again on appeal that the parents failed to establish that BAC was appropriate.  Specifically, it reasserts that BAC did not provide related services to P.H. during the school day, and that the IHO ignored this factor in finding the school appropriate.  M.H. Appellant's Br. 64-65.  The DOE argues that in order to be appropriate, a private placement must provide "an educational program and the necessary support services to appropriately meet [P.H.'s] special education needs."  Id. at 65 (citing, inter alia, Frank G., 459 F.3d at 364-65).  The DOE further contends that the BAC program was more restrictive than necessary, and that P.H. would have had more opportunities to interact with mainstream peers at P.S. 94.  Id. at 67-68.

The parents concede that BAC does not offer related services during the school day, but argue that the placement nevertheless was appropriate because BAC met P.H.'s educational needs and gave him more access to mainstream peers than P.S. 94 would have.  Further, they say, P.H. would have received related services "at a separate location," even under the IEP's recommended program, rendering BAC's alleged shortcoming immaterial.  M.H. Appellee's Br. 49-52.  With regard to related services, the parents contend that BAC offered all of the

services P.H. needed to receive educational benefits, and his related services could be "provided at any time of day."  Id. at 51.  The plaintiffs also argue that in any event, the IHO's opinion on this issue warranted deference, and that the DOE's argument to the contrary asks the court to "[a]ssign[] new weight[] to the evidence" that the IHO already reviewed, which is "precisely what a court avoids when it conducts a modified de novo review . . . ."  Id. at 54 (internal quotation marks omitted).

In Gagliardo, we concluded that the parents' unilateral placement was inappropriate because the chosen school "did not provide the special education services specifically needed" by the student -- that is, the "therapeutic setting" the student required to "reasonably assure that he would receive educational benefits as required by Rowley."  Gagliardo, 489 F.3d at 113, 114.  Here, it appears that although the related services do to some extent enhance P.H.'s learning ability, there is nothing in the record to suggest that it is necessary that they be provided during the school day in order for P.H. to receive appropriate benefit from them.

The DOE also cites Green v. N.Y.C. Dep't of Educ., No. 07 Civ. 1259 (PKC), 2008 WL 919609, 2008 U.S. Dist. LEXIS 32118 (S.D.N.Y. Mar. 31, 2008), in which the district court affirmed the IHO's and SRO's conclusion that the unilateral placement was

80

not appropriate. Id. at *8, 2008 U.S. Dist. LEXIS 32118, at *23. In reaching that conclusion, the Green court noted that "[i]t is appropriate for the hearing officers and the Court" to take into consideration the fact that the parents obtained necessary services not offered through the selected school from an outside agency. Id. at *7, 2008 U.S. Dist. LEXIS 32118 at *19. This may indeed be an appropriate consideration, but it is not necessarily dispositive. Here, the absence of related services at BAC does not require a finding that BAC was inappropriate.

With regard to mainstreaming opportunities for P.H., the record suggests that they were not abundant at the alternative placement, P.S. 94. Indeed, P.H. likely would have had more exposure to and interaction with mainstream peers at BAC. The DOE argues that opportunities for mainstreaming would be greater at P.S. 94, because the special education placement there shares a building with a mainstream public school. However, as we have noted, according to P.H.'s father, M.H., the P.S. 94 teacher, Oliva Cebrian, told him that the mainstream children who share the P.S. 15 building with P.S. 94 students are "not particularly welcoming to the special ed[ucation] kids." M.H. J.A. 729. As a result, the special education children use a separate entrance to the school, eat in a separate cafeteria, and do not share academic classes. Id. By contrast, although P.H. participated in a special education-only class at BAC, the

facility is also located within a mainstream school, and P.H. participated in two non-academic classes with mainstream children. Unlike the situation at P.S. 94, the BAC students also share a school entrance, hallways, and playtime with non-disabled peers.

In light of this unrebutted evidence, the district court properly agreed with the IHO's conclusion that BAC was an appropriate unilateral placement for P.H.

E.    Equitable Considerations

Finally, both administrative review officers and courts are required to evaluate the equities in considering a tuition reimbursement claim. Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 12 (1993). In this case, the SRO did not reach the issue, although the IHO had done so. The IHO found "that equitable considerations support tuition reimbursement." Id. 1357. The IHO noted that "the parents have cooperated with the CSE. They provided private evaluations, participated in the IEP meeting, visited the proposed placement and provided timely notice of their intent to place the student in a private school." Id. The district court agreed. It also identified "other evidence in the record" that supports the IHO's conclusion, M.H., 712 F. Supp. 2d at 167, including that "the DOE was less than forthcoming about the nature of P.H.'s recommended placement," id., that the plaintiffs were not provided the opportunity to

82

meaningfully participate in the CSE meeting, id., and that the DOE subsequently "consistently stonewalled M.H.'s inquiries into the appropriateness" of the school, id. at 168.  The DOE does not appear to contest the district court's or IHO's evaluation of this evidence on appeal.[12]  We agree with the district court's analysis on this point.

**IV.  Analysis of Claims in M.S.**

The plaintiffs in M.S. contest both the procedural and the substantive adequacy of their son's IEP.  Central to their argument is the assertion that the magistrate judge overstated the degree to which he was required to defer to the decisions of the administrative hearing officers.  Although we agree that the magistrate judge was too deferential to the State's adjudication process, we think that application of the proper standard of review requires the same outcome.

A.  Procedural Compliance

The parents asserted before the district court that the "development of the IEP was procedurally deficient [first]

_____

[12]   We take no position on whether anything short of total reimbursement for P.H.'s private tuition at BAC would have been appropriate under the Supreme Court's decision in Carter, 510 U.S. at 16 ("Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable."), had the DOE identified before the state administrative officers or the district court particular services provided by BAC that the district considered unnecessary to the provision of a FAPE (and for which reimbursement was therefore not required) or had otherwise shown that only a portion of P.H.'s tuition cost should be reimbursed.

83

because the parent waived the inclusion of a parent member in the CSE under duress, and the absence of such a participant in the meeting denied the plaintiffs active participation in the development of the IEP." Id. (internal quotation marks omitted). The district court adopted the magistrate judge's recommendation that it accept the IHO's and SRO's conclusion that even if D.S.'s parent waived the presence of a parent member at the CSE meeting under less than ideal circumstances, the "parent still participated in the development of the IEP." Because of that participation, the magistrate judge concluded, any violation did not "rise to a denial of [a] FAPE." Id. (internal quotation marks omitted). The magistrate judge noted that "courts have upheld parents' waivers of the participation of a parent member under similar circumstances," and recommended that the court do so in this case, too. Id. at 45. The magistrate judge did not suggest that this recommendation was influenced by his understanding of the deference required by Grim and this Court's other related decisions. The district court adopted this reasoning.[13]

The parents offer no evidence of duress other than their own testimony, id., which the IHO heard and found

---

[13] Because the district court adopted the more thorough reasoning of the Magistrate Judge in the Report and Recommendation, in this section we refer mainly to the R&R. But, of course, we are here reviewing the decision of the district court adopting the R&R.

84

unpersuasive on this point, <u>id.</u> at 44.[14]  Without any other evidence in the record to the contrary, the Court must defer to the IHO and SRO's findings, which were grounded in credibility determinations made by the IHO after hearing the relevant testimony.

Second, the parents contend the DOE violated the IDEA's requirement that an IEP include measurable goals that are appropriate for the child's development by photocopying goals from a prior IEP.  The parents assert that it is impossible for the CSE team to have reviewed all of the photocopied goals in light of the shortness of the meeting and especially Pearl's late arrival.  Only 25 to 30 minutes were left for the CSE to review seventeen pages of goals and "discuss[] and intentionally preserve[]" each one.  <u>M.S.</u> Appellants' Br. 49.  The DOE contends to the contrary that the photocopy was, as the IHO found, "'insignificant,'" "especially given that the 'record was replete with testimony as to D.S.'s very slow learning style,' which would render past information, particularly information that was gathered only a few months prior to the CSE, still very accurate."  <u>M.S.</u> Appellee's Br. at 43 (brackets omitted).

The IDEA requires that an IEP be "updated annually," 20 U.S.C. § 1414(d)(1)(A)(i)(VIII), and revised "as appropriate," 20

_____

[14]  The SRO did not specifically address the issue.

U.S.C. § 1414(d)(4)(A)(ii), see also Schroll v. Bd. of Educ. Champaign Cmty. Unit. Sch. Dist. #4, No. 06-2200-DGB, 2007 WL 2681207, at *4-*5, 2007 U.S. Dist. LEXIS 62478, at *12 (C.D. Ill. Aug. 10, 2007) ("An IEP is not inappropriate simply because it does not change significantly on an annual basis[, but] . . . if the student made no progress under a particular IEP in a particular year, . . . the propriety of an identical IEP in the next year may be questionable.").

We agree with the magistrate judge that the photocopying of the goals was "disturbing." R&R at 49. But the IHO's determination that the photocopy remained sufficient for purposes of arriving at D.S.'s IEP appears to have been based in part on the DOE's witnesses who explained that the goals, although a year old, nonetheless remained appropriate for the child. Dr. Bowser testified that D.S.'s general academic goals had been discussed at the CSE meeting, and that at least one goal was revised after the CSE meeting, when it became clear that "there was one goal that was either unclear or he had met." M.S. J.A. 151. Bowser also testified that some of the goals were photocopied from D.S.'s last CPSE (that is, his pre-school CSE) meeting, which had taken place only a few months prior to the CSE meeting. In light of that testimony and without more evidence that the photocopied goals were no longer appropriate for D.S., we agree with the district court's deference to the IHO, who had

86

the benefit of hearing and weighing witness testimony on the issue.

The plaintiffs' contention that they were not afforded the opportunity adequately to participate in the CSE meeting also fails. At the meeting, D.S.'s parents discussed D.S.'s ability to learn effectively in a 6:1:1 classroom setting. They provided the CSE with additional private evaluations of D.S. As the IHO rightly observed, these reports were noted on the IEP checklist, which indicated that they had been reviewed. But even assuming to the contrary that the school district failed to review these outside reports, we disagree with the appellants' contention that D.S.'s IEP therefore failed to reflect his then-current needs. The record evidence demonstrates that D.S.'s IEP incorporated performance reports that were more recent than those submitted by the appellants at the CSE meeting.

Finally, the appellants suggest that the school district predetermined D.S.'s placement in a 6:1:1 classroom. We disagree. In Deal ex rel. Deal v. Hamilton County Bd. of Educ., 392 F.3d 840 (6th Cir. 2004), cert. denied, 546 U.S. 936 (2005), the Sixth Circuit held that the plaintiffs were denied meaningful participation in the IEP process because the school district "never even treated a one-on-one ABA program as a viable option." Id. at 858. In T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247 (2d Cir. 2009), we expressly distinguished

Deal. We observed that "the school district [in Deal] had consistently rejected parent requests for intensive ABA and told the parents that 'the powers that be' were not implementing such programs." Id. at 253 (quoting Deal, 392 F.3d at 855-56). Here, the only evidence indicating that such a policy was in place was Bowser's testimony that as far as she knew, only 6:1:1 programs were provided by the district. This testimony is a far cry from the evidence that troubled the court in Deal. In light of the district's broad discretion to adopt programs that, in its educational judgment, are most pedagogically effective, we cannot simply assume that the decision to rely heavily on a single method or style of instruction is necessarily inappropriate. Bowser's testimony does not tend to establish that the district would not consider a 1:1 placement in an appropriate case. Absent such evidence, the only issue here is whether the district's proposed placement was insufficient to provide a FAPE to D.S.

B.      Substantive Adequacy

        The plaintiffs also challenge the IEP's substantive adequacy because, they argue, the IHO ignored evidence demonstrating that the IEP was not individualized to meet D.S.'s needs and thus failed to consider the record as a whole. The record as a whole, they say, showed that D.S. required ABA 1:1 therapy to progress.

88

As the IHO acknowledged, Dr. Bowser testified that she chose the 6:1:1 program for D.S. instead of the ABA program because it would provide careful supervision while addressing the needs and deficiencies that were outlined in his IEP. Dr. Bowser recognized that D.S. was a non-verbal child with significant deficiencies, including low intellectual functioning, and difficulties with social interactions. She also stated that the team that formed D.S.'s IEP chose the 6:1:1 classroom program with these deficiencies in mind. Alex Campbell, the special education teacher in charge of the 6:1:1 class to which the IEP had assigned D.S., also reviewed D.S.'s IEP and testified that she had worked with students with similar deficiencies during the 2007-08 school year, and that those students had progressed toward their IEP goals.

The proposed 6:1:1 classroom, moreover, provided a transition program for students who had only had ABA therapy. Susan Cruz, the assistant principal at P.S. 15, testified that a student such as D.S. would transition to a setting with multiple methodologies through a program targeted toward his specific needs and experiences with ABA.

The IHO credited this testimony. She concluded that the district had provided evidence of the "specifics as to the appropriateness of [D.S.'s] recommended program and described how he would have met his IEP goals and met the standard of achieving

educational benefits from the program." M.S. S.P.A. 80. Further, the IHO credited Bowser's testimony that the CSE "wanted [D.S.] to be in the classroom as much as possible and by having the therapy within the school setting it would give the therapist a chance to interact with the classroom teacher and transfer the skills into the classroom setting." M.S. S.P.A. 79.

The magistrate judge disagreed with the IHO's assessment, stating that "[t]he only people . . . who had met and evaluated [D.S.] insisted that he required 1:1 ABA." R&R at 54. However, the magistrate judge felt "constrained to defer to the determination of the IHO and SRO," even on a question that he thought called for the simple application of "typical judicial experience," namely, whether the "IHO and SRO properly grappled with the evidence before them." Id. at 55.

We need not consider the magistrate judge's expressed views in this regard. The IHO's determination was based on his assessment of the credibility of the witnesses testifying before him, and his own understanding of educational methodology. See Grim, 346 F.3d at 383. It was entitled to deference on that basis.

The IHO was presented with conflicting evidence on the question of methodology: Some witnesses testified that D.S. would thrive in a 6:1:1 program utilizing methodologies other than ABA. Others, including DOE evaluator Marion Pearl,

90

expressed the view that D.S. required 1:1 ABA therapy on a full-time basis.  The IHO appears to have given greater credence to the witnesses who had not met D.S. because, in the IHO's view, the witnesses who testified for D.S. did not approach the possibility of his enrollment in a non-ABA program with an open mind.  While the court may have had doubts about the IHO's credibility assessment, it did not have further evidence on the basis of which to challenge this determination.  And this conclusion is further buttressed by the fact that the IHO's determination concerned the substantive adequacy of the IEP, a question requiring expertise on education of autistic children and to which courts therefore should usually defer to administrative decisionmakers.  See Rowley, 458 U.S. at 208.

We would be remiss if we did not note that we deeply respect and sympathize with M.S. and L.S.'s efforts on behalf of their son and their desire to obtain the best possible treatment for him under trying circumstances.  But it has not been established by a preponderance of the evidence that the IEP offered to D.S. by the State was inappropriate -- that is, that D.S. was denied a FAPE.

Because we conclude that D.S.'s IEP was procedurally and substantively adequate, we need not consider whether his private placement was appropriate.

**CONCLUSION**

For the foregoing reasons each of the judgments of the district courts in these cases consolidated for purposes of appeal is affirmed.

**APPENDIX**

**Glossary of Acronyms**

| | |
|---|---|
| ABA | Applied Behavior Analysis |
| BAC | Brooklyn Autism Center |
| CPSE | Department of Education's Committee on Preschool Special Education |
| CSE | Local Committee on Special Education |
| DOE | New York City Department of Education |
| D.S. | Son of plaintiffs M.S. and L.S. |
| E.I. | New York's Early Intervention program |
| E.K. | Plaintiff, mother of P.H. |
| FAPE | Free Appropriate Public Education |
| FBA | Functional Behavioral Assessment |
| IDEA | Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. |
| IEP | Individualized Education Program |
| IHO | District's Impartial Hearing Officer |
| L.S. | Plaintiff, mother of D.S. |
| M.H. | Plaintiff, father of P.H. |
| M.H. J.A. | M.H. Joint Appendix |
| M.S. | Plaintiff, father of D.S. |
| M.S. J.A. | M.S. Joint Appendix |
| M.S. S.P.A. | M.S. Special Appendix |
| NYCRR | N.Y. Comp. Codes R. & Regs. |

1

| | | |
|---|---|---|
| PDD-NOS | | Pervasive Developmental Disorder Not Otherwise Specified |
| PECS | | Picture Exchange Communication System |
| P.H. | | Son of plaintiffs M.H. and E.K. |
| R&R | | Report and Recommendation of the magistrate judge in D.S. |
| SEIT | | Special Education Itinerant Teacher |
| SRO | | State Review Officer |
| TEACCH | | Treatment and Education of Autistic and Related Communication-Handicapped Children, a method for teaching people with autism. |